**FUNPLEX PARTNERSHIP, a Colorado Partnership; Chado III, a Colorado General Partnership; and J. Robert Chado, Plaintiffs,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Silverado Banking, Savings and Loan Association; and First Commercial Corporation, Defendants.**

Civil Action No. 97–Z–2592.

United States District Court,
D. Colorado.

Aug. 20, 1998.

Gordon W. Netzorg, Cecil E. Morris, Jr., Peter George Koclanes, Netzorg & McKeever, P.C., Denver, CO, for Funplex Partnership, Chado III, and J. Robert Chado.

Gordon W. Netzorg, Cecil E. Morris, Jr., Peter George Koclanes, Netzorg & McKeever, P.C., Denver, CO, John B. Moorhead, Baker & Hostetler, Denver, CO, for Entertainment Center, II, Inc.

Vicki S. Porter, Vicki S. Porter, P.C., Denver, CO, for F.D.I.C.

Frank W. Visciano, Senn, Lewis, Visciano & Strahle, P.C., Denver, CO, for First Commercial Corp.

## MINUTE ORDER

WEINSHIENK, Senior District Judge.

Because it appears that Magistrate Judge Coan's Order of June 15, 1998 is neither clearly erroneous nor contrary to law, *see* 28 U.S.C. § 636(b)(1)(A), it is

ORDERED that Plaintiffs' Objections To Magistrate Judge's Order Denying Motion To Disqualify are overruled, and the Magistrate Judge's Order ... is affirmed. It is

FURTHER ORDERED that Defendant First Commercial Corporation's Motion For Leave To File Reply Brief is granted, and the tendered reply is accepted for consideration by the Court.

## ORDER RE: PLAINTIFFS' MOTION TO DISQUALIFY COUNSEL

COAN, United States Magistrate Judge.

This matter is before the court on Plaintiffs' Motion to Disqualify Counsel [filed April 29, 1998]. The motion was referred to the undersigned magistrate judge for disposition on May 27, 1998 by a Special Order of Reference under D.C.Colo.LR 72.1. The matter has been fully briefed. An evidentiary hearing was held on May 28, 1998 and June 2, 1998 at which the parties presented witness testimony, documentary evidence, and additional arguments to the court.

Plaintiffs seek an order disqualifying the law firm of Senn, Lewis, Visciano & Strahle, P.C. ("Senn, Lewis") from representing defendant First Commercial in this action and in two foreclosure actions pending in Jefferson County District Court, because the Senn, Lewis law firm previously represented plaintiff Chado on a "related matter" in January and February 1997.

J. Robert Chado, plaintiff, and Don Saavedra, plaintiff's real estate agent for transactions involving real property relevant

to the claims raised in the Second Amended Verified Complaint and Plaintiffs' Motion to Disqualify Counsel, testified at the evidentiary hearing in support of plaintiffs' motion to disqualify. Frank Visciano, Mark Senn, Brian Reichel, and Wynn Strahle, associates or shareholders in the Senn, Lewis law firm during the relevant time period, testified on behalf of Senn, Lewis.

## I. Background

This action arises out of a loan made by the Silverado Banking, Savings and Loan, Association to plaintiff Funplex in 1986. Plaintiff Chado is a general partner of plaintiff Chado III and Chado III is a general partner of plaintiff Funplex. The second amended verified complaint alleges that the FDIC was appointed receiver of Silverado in 1988 and thereby became the holder of the Funplex loan. Second amended verified complaint, ¶ 10. Plaintiffs and the FDIC restructured the loan in August 1991 pursuant to a "workout agreement" under which plaintiffs would make monthly payments until the loan became due in August 1994. *Id.* ¶ 11. When the loan matured under the terms of the workout agreement in August 1994, plaintiffs did not receive any notice or demand from the FDIC. *Id.* ¶ 12. Plaintiff Chado thereafter contacted the FDIC to negotiate an agreement that would allow Funplex to buy out the loan from the FDIC. *Id.* Chado had ongoing discussions with the FDIC in an effort to reach a resolution on the loan. *Id.* ¶¶ 13–15. Chado eventually agreed with an FDIC agent in March or April 1997 that Funplex would pay off the loan for $4.2 million. *Id.* ¶¶ 16–19. In May 1997, a new FDIC agent was assigned to the case who advised Chado that he was not obligated under any loan payoff agreements reached between Chado and other FDIC agents. *Id.* ¶ 22. The new agent represented to Chado that the FDIC would not sell the loan to a third party while Funplex was in the process of submitting requested financial information and taking action to pay off the loan. *Id.* ¶¶ 23. Notwithstanding the FDIC's representations to Chado, the FDIC scheduled a sale of the loan to defendant First Commercial and set the closing for mid-December 1997. *Id.* ¶ 31. Plaintiffs

provided First Commercial with actual notice of Chado's and Funplex's prior agreements with the FDIC to pay off the loan and not sell the loan to a third party prior to the closing date. *Id.* ¶ 32. Plaintiffs allege that the FDIC and First Commercial have refused to recognize plaintiffs' agreement with the FDIC and that the loan was sold to First Commercial in December 1997. *Id.* ¶ 32.

Plaintiffs filed the instant action on December 11, 1997. The claims asserted in plaintiffs' second amended verified complaint arise out of the FDIC's alleged breach of the agreement with plaintiffs to allow plaintiffs to pay off the loan for $4.1 million, the FDIC's agreement with plaintiffs that the loan would not be sold to a third party, and First Commercial's refusal to recognize and abide by the agreements between Chado and the FDIC. Plaintiffs assert claims against First Commercial for tortious interference with contract, tortious interference with prospective business advantage, constructive trust, and for declaratory relief regarding the payoff of the loan.

## II. Findings of Fact

For purposes of the within order, the court finds as follows.

In connection with the 1986 Funplex loan agreement, Chado executed a promissory note secured, in part, by three adjacent tracts of land which comprise the property known as "44th and Kipling," which was owned by Chado at that time. (Chado testimony; Plaintiffs' Hearing Ex. 8). One tract of that property was encumbered by a first deed of trust to the Jefferson County School Board and a second deed of trust to the FDIC. (Chado testimony). When the Jefferson County School Board foreclosed on that property in 1995, Chado received notice of the foreclosure, but did not make an effort to redeem the property at that time because he did not have the financial means to do so. (Chado testimony). The foreclosed property was thereafter sold to Mr. Kettleson. (Chado testimony). The FDIC did not receive notice of the foreclosure by the Jefferson County School Board. (Chado testimony).

After the foreclosed property was sold to Kettleson, Chado talked with FDIC agent Wood regarding what action, if any, the FDIC would take to redeem the property. (Chado and Saavedra testimony). One scenario discussed by Chado and Wood was that the FDIC would take action to redeem the foreclosed property if Chado paid the FDIC's costs associated with that litigation. (Chado testimony).

Chado's ownership of the foreclosed property was necessary for a global resolution of his indebtedness to the FDIC because Chado would not be able to realize the full commercial value of the 44th and Kipling property unless he could sell the entire property, including the parcel which had been foreclosed upon, free and clear of all liens. (Chado and Saavedra testimony). One of the proposed "global solutions" discussed by Chado and the FDIC in 1996 and during the first trimester of 1997 was dependent upon Chado's sale of all three tracts comprising the 44th and Kipling property, and application of the sale proceeds to reduce the indebtedness on the Funplex loan to $2.5 million. (Plaintiffs' Hearing Ex. 2, pp. 62–63; p. II–373; Plaintiffs' Hearing Ex. 7, Bate-stamp No. 487–489); (Chado testimony). To achieve that goal, the FDIC needed to redeem the property foreclosed upon and sold by the Jefferson County School Board, convey the real property to Chado, and then release any deeds of trust encumbering that property which were held by the FDIC. (Senn, Lewis Ex. B; Chado testimony).

The FDIC, through its agent Michael Wood, advised Chado by letters dated December 19, 1996 (Plaintiffs' Hearing Ex. 3), and January 27, 1997 (Senn, Lewis Hearing Ex. G), that the FDIC would not take action to redeem the foreclosed property sold to Kettleson. (Chado testimony). Saavedra thereafter advised plaintiff to seek immediate legal consultation regarding the FDIC's position that the FDIC would not take action to redeem the foreclosed property. (Chado and Saavedra testimony).

Marshall Fishman was Chado's attorney with respect to the Funplex loan issues. Because Fishman was out of town, Saavedra recommended that Chado consult with Mark Senn, a commercial real estate lawyer. (Chado testimony). Saavedra had business dealings with Senn in the past and contacted him to arrange a consultation for Chado. (Saavedra and Senn testimony).

Chado and Saavedra met with Senn on January 29, 1997. (Chado, Saavedra, and Senn testimony; Plaintiffs' Hearing Ex. 5). The stated purpose of Chado's consultation with Senn was to determine the feasibility of Chado setting aside the foreclosure based on the failure of the FDIC to receive notice of the foreclosure. (Chado, Saavedra, Senn and Reichel testimony). Senn asked Chado and Saavedra who the interested parties would be in an attempt to set aside the foreclosure. (Senn testimony). Upon learning that the FDIC was an interested party, Senn advised Chado and Saavedra that he could not represent Chado in any matter adverse to the FDIC because the Senn, Lewis firm represented the FDIC in various other matters. (Senn testimony). Chado responded that, with regard to his redemption of the foreclosed property, Chado's interests and the FDIC's interests were aligned, and not adverse. (Senn testimony).

After Chado and Saavedra identified the legal issue at the January 29, 1997 meeting, Senn realized that he did not have the required expertise and asked Brian Reichel, whose practice emphasizes general commercial litigation, to take the lead in the consultation. (Senn and Reichel testimony). Senn explained the legal issue to Reichel, who took over the consultation at that point. (Senn testimony). Chado provided Reichel and Senn with background information regarding the history of his dealings with the FDIC regarding the Funplex loan (Chado and Saavedra testimony) and told Reichel and Senn that he needed to regain ownership of the foreclosed property so that he could sell the property and apply the proceeds to the Funplex loan note held by the FDIC. (Chado, Saavedra and Reichel testimony). Chado brought what he referred to as his "44th and Kipling file" to that meeting but he did not recall what specific documents were provided to the Senn, Lewis attorneys for their review, other than plat drawings and legal descriptions of the 44th and Kipling proper-

ty. (Chado testimony). Saavedra gave Senn and Reichel a copy of the FDIC's December 1996 letter to Chado. (Saavedra testimony).

At the conclusion of the January 29, 1997 meeting, Reichel asked Saavedra to provide him with copies of the title insurance commitment for the foreclosed property and a copy of the Jefferson County public trustee's file regarding the foreclosure. (Saavedra and Senn testimony). No other tasks were assigned to Chado or Saavedra. (Senn testimony). The participants in the January 29, 1997 meeting did not discuss potential resolution of Chado's loan issues with the FDIC at that meeting. (Senn, Reichel testimony).

Chado did not speak to Senn, Reichel or Strahle, after the January 29, 1997 meeting (Chado, Senn, Reichel and Strahle testimony), nor did Senn speak to Saavedra, acting in his capacity as Chado's agent, after the January 29, 1997 meeting (Senn testimony). Chado was called out of town on a personal matter and authorized Saavedra to consult with the Senn, Lewis attorneys on his behalf. (Chado and Saavedra testimony). Saavedra thereafter spoke to Reichel and Strahle (who specialized in foreclosure and receivership matters) on February 5, 1997. (Saavedra, Reichel and Strahle testimony). Reichel and Strahle advised Saavedra that they had researched the possibility of Chado setting aside the Jefferson County School Board foreclosure and provided Saavedra with a legal opinion based on that research. (Reichel and Strahle testimony). Reichel and Strahle did not discuss with Saavedra any possible claims that Chado might have against the FDIC regarding the Funplex loan during that conversation, or at any other time. (Reichel and Strahle testimony).

Chado did not request any further representation or consultation from Senn, Lewis after February 5, 1997. (Chado testimony). The Senn, Lewis firm sent plaintiff a single billing statement, dated February 29, 1997, for legal services rendered between January 29, 1997 and February 5, 1997. (Plaintiffs' Hearing Ex. 5). The words "lien payoff" in the February 5, 1997 entry of the Senn Lewis billing statement issued to Chado refers to the lien which the Jefferson County School District held against the foreclosed property which was sold to Kettleson. (*Id.*, Reichel testimony).

Plaintiffs filed the instant action against the FDIC and First Commercial in December 1997. See Verified Complaint for Declaratory and Injunctive Relief filed December 11, 1997. Frank W. Visciano began representing defendant First Commercial in December 1997. (Visciano testimony). Visciano also represents First Commercial in connection with foreclosure actions on the remaining two tracts of the 44th and Kipling property which are pending in Jefferson County District Court. (Visciano testimony).

After the original complaint in the instant action was filed, Senn reviewed a copy of the complaint and advised Visciano that the firm had previously consulted with Chado on a foreclosure issue. (Senn and Visciano testimony). Senn did not advise Visciano to disclose the prior representation to Chado. (Senn testimony). Reichel disclosed his file regarding the January and February 1997 Chado consultation to Visciano after he learned that Visciano was going to represent First Commercial in the instant matter. (Reichel testimony; Defendant's Ex. C–1 [1]). Reichel advised Visciano that he had consulted with Chado in early 1997 on the sole issue of the feasibility of setting aside a foreclosure of property owned by Chado and subsequently sold to a third party. (Reichel and Visciano testimony). Strahle did not speak to Visciano about her representation of First Commercial in the instant litigation because she was not working at the Senn, Lewis firm in December 1997. (Strahle and Visciano testimony).

---

1. Defendants originally tendered their entire file on the January–February 1997 Chado consultation to the court as defendants' Ex. C. The file consisted of less than ten pre-existing documents provided by Chado and Saavedra to the Senn, Lewis attorneys. The court rejected that tender, however, because some of the documents contained notations made by either Chado, Saavedra, Senn or Reichel during the January 29, 1997 consultation. Instead, the court accepted as Defendants' Hearing Ex. C–1 those documents from the file which did not contain any attorney-client communications.

Visciano deposed Chado on April 22 and 23, 1998. (Plaintiffs' Hearing Exs. 1 and 2). During that deposition, Visciano questioned Chado about appraisals done on the 44th and Kipling property in 1997. (*Id.;* Chado and Visciano testimony). On April 27, 1998, Chado spoke to Saavedra about the appraisals and informed Saavedra that Visciano had requested the information during his deposition of Chado. (Chado testimony; Chado Affidavit, ¶ 4). Saavedra then informed Chado that Visciano was a shareholder in the Senn, Lewis firm, the law firm he and Chado had consulted in January and February 1997. (Chado and Saavedra testimony). Chado was unaware that Visciano, Senn, Reichel and Strahle were attorneys in the same law firm until Saavedra advised him. (Chado testimony). Chado objects to the Senn, Lewis law firm's representation of First Commercial in the instant litigation and in foreclosure actions pending in Jefferson County District Court. (Chado testimony). No one from the Senn Lewis law firm consulted with Chado prior to undertaking representation of First Commercial. (Chado and Visciano testimony).

Visciano has not reviewed the contents of the Senn, Lewis file on Chado; he has not used any information contained in that file in the instant litigation, nor has he discussed with Senn, Reichel, or Strahle the contents of communications between them and Chado or Saavedra in January and February 1997. (Visciano, Senn, Reichel and Strahle testimony).

## III. Legal Analysis

Plaintiffs contend that the Senn, Lewis law firm should be disqualified from further representation of defendant First Commercial in the instant action, and in pending state court actions involving the remaining two parcels of the 44th and Kipling property, pursuant to Colorado Professional Rules of Conduct 1.9 and 1.10 which state:

Rule 1.9—Conflict of Interest: Former Client

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

Rule 1.10 Imputed Disqualification: General Rule

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule ... 1.9 ...

The District of Colorado has adopted the Colorado Rules of Professional Conduct as its standard of professional conduct. *See* D.C.Colo.LR 83.6. The Colorado Rules of Professional Conduct are patterned after the ABA Model Rules of Professional Conduct.

Motions to disqualify counsel rest within the sound discretion of the trial court. *FDIC v. Sierra Resources, Inc.,* 682 F.Supp. 1167, 1170 (D.Colo.1987). The party seeking disqualification under Rule 1.9 must provide the court with specific facts to show that disqualification is necessary and he cannot rely on speculation or conjecture. *Id.* Specifically, the moving party must show that: "(1) an attorney-client relationship existed in the past; (2) the present litigation involves a matter that is 'substantially related' to the prior litigation; (3) the present client's interests are materially adverse to the former client's interests; and (4) the former client has not consented to the disputed representation after consultation." *English Feedlot, Inc. v. Norden Lab., Inc.,* 833 F.Supp. 1498, 1506 (D.Colo.1993).

In the instant action, it is undisputed that an attorney-client relationship once existed between Chado and the Senn, Lewis firm and that no attorney from the Senn, Lewis firm consulted with Chado prior to representing defendant First Commercial in the instant action. Further, Senn Lewis does not dispute that the interests of Chado and First Commercial are adverse in this action. Rather, the focus of the disagreement is whether the matter of Senn, Lewis' former representation of Chado is "substantially related" to the matter of Senn, Lewis' present representation of First Commercial.

■ "Substantiality is present if the factual contexts of the two representations are similar or related." *English Feedlot, Inc.*, 833 F.Supp. at 1506 (internal citation omitted); *Cole v. Ruidoso Municipal Schools*, 43 F.3d 1373, 1384 (10th Cir.1994). The plaintiffs must provide the court with sufficient evidence to enable the court "to reconstruct the attorneys' representation of the former client, to infer what confidential information could have been imparted in that representation, and to decide whether that information has any relevance to the attorney's representation of the current client." *Id.* (citing *Koch v. Koch Industries*, 798 F.Supp. 1525, 1536 (D.Kan.1992)). However, the former client is not required to reveal the substance of his communications to the attorney as such a disclosure would defeat the purpose of disqualification. *Cole*, 43 F.3d at 1384 n. 8 (applying New Mexico Rule of Professional Conduct 16–109 which was patterned after ABA Model Rules); *In re Blinder, Robinson & Co., Inc.*, 123 B.R. 900, 910 (Bkrtcy.D.Colo. 1991). Inquiry into the subject of the consultation is appropriate. *Cole*, 43 F.3d at 1384.[2]

■ "The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." *Cole*, 43 F.3d at 1384 (quoting ABA Model Rule 1.9 cmt.). If there is a reasonable probability that during the course of the earlier representation, the former client disclosed confidential information which could be used against him in the subsequent adverse representation, the two matters are considered to be substantially related. *SLC Limited V v. Bradford Group West, Inc.*, 999 F.2d 464, 467 n. 3 (10th Cir.1993) (applying Utah Prof.Conduct Rule 1.9 which requires that the representations be "substantially factually related").[3] If the court finds a substantial relationship between the former and present representations, an irrebuttable presumption arises that the client has revealed confidential information to the attorney that requires disqualification. *English Feedlot, Inc.*, 833 F.Supp. at 1506 (citing *Smith*, 757 F.2d at 1100).

Plaintiffs argue that there is a substantial relationship between the matter in which the Senn, Lewis firm previously represented Chado and the matters in which the Senn, Lewis firm currently represents defendant First Commercial in that the two representations involve substantially similar legal and factual issues regarding plaintiffs' dealings with the FDIC regarding the Funplex loan.

Senn, Lewis contends that no substantial relationship between the former and current representations exists because the only connection between the two representations is that the tract of property foreclosed upon by the Jefferson County School District and sold to Mr. Kettleson is one of three parcels of property which comprise the 44th and Kipling property that was originally pledged by Chado as security for the Funplex loan promissory note. Senn, Lewis maintains that the evidence shows that no confidential information relevant to the instant litigation was disclosed by Chado and Saavedra to Senn, Lewis attorneys in January and February 1997.

■ The purpose of Rules 1.9 and 1.10 is to protect a client's confidential communications with his attorney. Chado and Saavedra testified that during the January 29, 1997 meeting, they disclosed to Reichel and Senn a detailed chronological history of events relating to the Funplex loan. *See, also,* Motion to Disqualify Counsel, Chado affidavit at ¶ 7, Plaintiffs' Ex. B. The factual background information which Chado states he provided to Senn and Reichel about the history of his dealings with the FDIC is the same factual background which forms the basis of plaintiffs' claims against the FDIC and First Commercial in the instant action, as set forth in the Second Amended Verified Complaint at ¶¶ 9–32. Chado also provided a "chronological history" of his dealings with the

---

**2.** At the evidentiary hearing, the court limited the testimony regarding Chado and Saavedra's communications with Senn, Reichel and Strahle to the subjects that were discussed, rather than the substance of those communications.

**3.** Utah Prof.Conduct Rule 1.9 codifies the substantial factual relationship test adopted by the Tenth Circuit Court of Appeals in *Smith v. Whatcott*, 757 F.2d 1098, 1100 (10th Cir.1985). The *Smith* case also arose out of the District of Utah.

FDIC regarding the Funplex loan to FDIC Agent Sims in July 1997 after Sims refused to recognize the alleged payoff agreement that Chado had reached with Agent Wood, Sims' predecessor. *See* Plaintiffs' Hearing Ex. 1, pp. 267–271. In addition, documents detailing Chado's dealings with the FDIC regarding the Funplex loan were offered and admitted as evidence in support of plaintiffs' Motion to Disqualify Counsel. *See* Plaintiffs' Hearing Exs. 1, 2, 3, 7, 8; Senn, Lewis Hearing Ex. G. Thus, assuming that Chado did disclose the chronological history of his dealings with the FDIC to the Senn, Lewis attorneys at the January 29, 1997 meeting, Chado has subsequently disclosed those same "confidential communications" to third parties.

The court finds that plaintiffs have not offered persuasive evidence in support of their assertion that Chado and Saavedra discussed with Senn, Reichel and Strahle possible claims Chado might have against the FDIC. It is undisputed that no Senn, Lewis attorney gave any legal opinions to Chado in January 1997. Instead, on February 5, 1997, Reichel and Strahle gave Saavedra, acting as Chado's agent, their legal opinion regarding the probability of Chado successfully setting aside the foreclosure by the Jefferson County School District and subsequent sale to Kettleson. Saavedra testified that the Senn, Lewis attorneys also rendered an opinion regarding "the FDIC lien." That testimony concerns the FDIC's junior lien on the property foreclosed upon by the Jefferson County School Board. The basis of Chado's efforts to attempt to redeem the property was the fact that the FDIC did not get notice. Further, the Senn, Lewis billing statement makes reference only to the foreclosed property issue. The court's conclusion that Senn, Lewis attorneys did not give legal opinions regarding Chado's possible claims against the FDIC is reinforced by Senn's unrebutted testimony that during the January 29, 1997 meeting, upon being advised that the FDIC was an interested party to the Jefferson County foreclosure, Senn informed Chado and Saavedra that the Senn, Lewis firm represented the FDIC in other matters and would not consult with Chado regarding any action which would be adverse to the FDIC.

The court further finds that Chado's and Saavedra's communications with the Senn, Lewis attorneys in January and February 1997 regarding Chado's rights, if any, to redeem the property foreclosed upon by the Jefferson County School District, are not substantially related to the subject matter of the instant litigation. The plaintiffs presented significant evidence at the evidentiary hearing that Chado engaged in ongoing discussions with the FDIC in 1997 regarding a "global resolution" of the Funplex loan debt. Chado states that his ability to sell the 44th and Kipling property as a parcel including the foreclosed property and free and clear of all liens, was critical to his ability to pay off the debt. In order to sell the entire 44th and Kipling property, however, Chado needed to regain ownership of the foreclosed parcel and then pay off the FDIC's lien(s) on all three parcels. Chado therefore consulted with Senn, Lewis in January 1997 to determine whether he had any legal right to set aside the Jefferson County School Board foreclosure because it appeared that the FDIC would not be exercising any right it might have had to set aside the foreclosure for lack of notice.

The issue of Chado's legal right, if any, to redeem the foreclosed parcel of the 44th and Kipling property is a limited matter incidentally related to the claims asserted by plaintiffs in the instant action which are based upon an alleged agreement between Chado and the FDIC allowing plaintiff to buy out the Funplex note for $4.2 million, First Commercial's alleged refusal to recognize and abide by that agreement, and FDIC Agent Wood's conduct with Chado concerning the Funplex loan note. Plaintiffs have failed to show that the information Chado and Saavedra disclosed to Senn, Reichel and Strahle regarding the foreclosed property could be used against the plaintiffs by First Commercial in the instant litigation.

The court further finds that although Chado disclosed some amount of background history regarding the Funplex loan debt in order to provide factual context to the legal issue presented to Senn, Reichel and Strahle, Chado subsequently disclosed that same in-

formation to third parties thereby negating any intent to maintain the confidentiality of that information. Further, the court is not persuaded that any confidential information regarding Chado's "strategy" in dealing with the FDIC, as an adverse party, was discussed with the Senn, Lewis attorneys in January and February 1997.

The court concludes that the Senn, Lewis firm's representation of First Commercial in the instant action cannot "be justly regarded as a changing of sides in the matter in question." ABA Annotated Model Rules of Professional Conduct, Rule 1.9 cmt at p. 144 (3rd ed.1996). Visciano was therefore under no ethical obligation to apprise Chado of Visciano's representation of defendant First Commercial in the instant litigation. Accordingly,

IT IS **ORDERED** that Plaintiffs' Motion to Disqualify Counsel is **DENIED.**

June 15, 1998.